B. F. BUSH, Receiver of the ST. LOUIS, IRON MOUNTAIN and SOUTHERN RAILWAY COMPANY, Appellant, v. T. A. MILLER and C. B. MILLER, Partners, Doing Business under the name of T. A. MILLER LUMBER COMPANY, Respondents.

Springfield Court of Appeals, December 6, 1919.

1. **CARRIERS: Rate Becomes Effective When Filed With and Approved by Interstate Commerce Commission.** When a railroad's freight rate has been filed for the required length of time with the Interstate Commerce Commission, and authorized and adopted by the commission, it becomes effective though not filed with the station agents or posted in the different stations.

2. **CARRIERS: Failure to Publish and Post Duly Estabished Rate.** If a railroad violated the law with reference to publication and posting of a new tariff at stations affected, such violation did not nullify the rate or tariff as approved by the Interstate Commerce Commission after filing with it, but merely subjected the railroad to the penalty provided by the Interstate Commerce Act.

Appeal from Lawrence County Circuit Court.—*Hon. I. V. McPherson*, Special Judge.

REVERSED AND REMANDED. (*with directions.*)

*Barbour & McDavid* and *J. F. Green* for appellant.

(1) The laws of Congress regulating interstate shipments control over state laws on the same subject. Potter v. Railroad, 187 Mo. App. 56; Grain Co. v. Railroad, 177 Mo. App. 194; Hamilton v. Railroad, 177 Mo. App. 151; Railroad v. Hooker, 233 U. S. 109, 58 L. Ed. 875; Railroad v. Hefley, 158 U. S. 98, 39 L. Ed. 910. (2) The freight rate to be paid on an interstate shipment is controlled by the rate filed with the Interstate Commerce Commission, even though not posted in the station and even though erroneously quoted by the agent to the shipper and to the shipper's subsequent loss. Railroad v. Maxwell, 237 U. S. 94, 59 L. Ed. 853; Railroad v. Elevator Co., 226 U. S. 441, 57 L. Ed. 290; Railroad v. Carl, 227 U. S. 652, 57 L. Ed. 688; Railroad v. Mugg, 202 U. S. 242, 50 L. Ed. 1011; Railroad v. Hooker, 233 U. S. 110, 58 L. Ed. 875; Berwine Co. v. Railroad, 235 U. S. 371, 59 L. Ed. 275; Sloop v. Delano, 182 Mo. App. 299; Railroad v. Cisco Oil Mill, 204 U. S. 449, 51 L. Ed. 562; Bush v. Driller Co., 199 S. W. 599 (Mo. App.); Buren v. So. Pac. R., 26 I. C. C. 332; Portland Co. v. Railroad, 251

Fed. 33. (3) The lawful rate is that which the carrier must exact and that which the shipper must pay. The shipper's knowledge of the lawful rate is conclusively presumed, and the carrier may not be required to surrender the goods carried upon the payment of the rate paid, if that was less than the lawful rate, until the full legal rate has been paid. Railroad v. Maxwell, 237 U. S. 94, 59 L. Ed. 853; Railroad v. Carl, 227 U. S. 652, 57 L. Ed. 688; Railroad v. Mugg, 202 U. S. 242, 50 L. Ed. 1011; Railroad v. Hooker, 233 U. S. 110, 58 L. Ed. 875; Dunne v. Railroad, 166 Mo. App. 376; Sloop v. Delane, 182 Mo. App. 299; McFadden v. Railroad, 241 Fed. 565; Follmer v. Railroad, 21 I. C. C. 617. Railroad v. Hooker, 233 U. S. 110, 58 L. Ed. 875; Dayton Coal Co. v. Railroad, 239 U. S. 446, 60 L. Ed. 375; Berwine Co. v. Railroad, 235 U. S. 371, 59 L. Ed. 275; Railroad v. Elevator Co., 226 U. S. 441, 57 L. Ed. 290; Railroad v. Cisco Oil Mill, 204 U. S. 449, 51 L. Ed. 562; United States v. Miller, 223 U. S. 599, 56 L. Ed. 568; Wickwire Co. v. Railroad, 181 Fed. 319; Columbus Iron Co. v. Railroad, 178 Fed. 263; Railroad v. Feintuch, 191 Fed. 485; Bush v. Keystone Co., 199 S. W. 599, (Mo. App.); Franke Grain Co. v. Ill. C. R. Co., 27 I. C. C. 625; Burns v. So. Pac. R., 26 I. C. C. 332; Follmer v. Railroad, 21 I. C. C. 617; Spiegle Co. v. Railway, 34 I. C. C. 448; Portland Co. v. Railroad, 251 Fed. l. c. 34.

*Carr McNatt* for respondents.

(1) The tariff once established cannot be changed "except after thirty days' notice to the commission and to the public," published in same manner as original tariff, which must be promulgated. Interstate Commerce act, sec. 6, par. 3, U. S. statutes annotated, vol. 3. (a) "Promulgate" means to make known—it means that it shall be brought to the attention of those affected by it; that is, such publicity as will cause them to take notice of it. Wooden v. Western New York R. R. Co., 18 N. Y. Supp. 768. (b) "And from all the provisions on the subject, it is evident that the publication intended consists

in 'promulgating' and distributing the tariff in printed form preparatory to putting it in affect. U. S. v. Miller, 223 U. S. Repts. 599 to 604-and nearly all cases cited by appellant. Sec. 192, p. 54, conference rulings, Interstate Commerce Com. (See also rule No. 231, pp. 76, 77 of ruling) ; Sec. 8, Interstate Com. Act, vol. 3, U. S. statutes annotated and authorities cited thereunder, Railroad v. Maxwell, 237 U. S. 94, and sec. 9, Inter. Com. Act.

BRADLEY, J.—This is a suit by the receiver of the St. Louis, Iron Mountain & Southern Railway Company to recover $129.50, the alleged difference between the freight paid and the amount which plaintiff claims should have been paid on an interstate shipment, according to the rates alleged to be in force and effect at the time of the shipment, on eleven carloads of yellow pine lumber shipped from Boswell, Arkansas, to Hoberg, La Russell and Aurora, Missouri, on the Iron Mountain, and to nearby points on the Frisco. The cars for points on the Frisco were shipped on the Iron Mountain to Aurora and from there by the Frisco to points of destination. It is only the Iron Mountain rate, however, that is involved here. A jury was waived and the cause tried before the court resulting in a finding and judgment for defendants. From this judgment plaintiff appealed..

All of the shipments were, between November 3, 1914, and February 4, 1915. Plaintiff alleges that during this time the lawful rate as fixed by the St. Louis, Iron Mountain & Southern Railway Company, and filed with, and approved by the Interstate Commerce Commission, was 13 cents per hundred from Boswell, Arkansas, to the points of destination in Missouri. That the agents, by inadvertance and mistake, collected only 10½ cents per hundred on each of said shipments of lumber from Boswell, Arkansas, to Hoberg, La Russell and Aurora, Missouri. The lumber was shipped from Boswell by the Wideman Saw & Planing Mills of Boswell, Arkansas, to T. A. Miller Lumber Company, a copartnership.

Defendants paid the freight as demanded, and according to the bills of lading, at the points of destination. Defendants answered by a general denial, and set up a counterclaim. The court found against them on the counterclaim and it is out of the case. Defendants further set up in their answer that during the time of the shipments in question that the only tariff in procession of plaintiff's agent at Boswell, Arkansas, or about the station, was a tariff fixing the legal rate at 10½ cents per hundred, and that no tariff schedule fixing a higher rate had ever been delivered to said agent, or posted in said station. That defendants bought the lumber to be delivered to them at the several destinations at a specified price, and were to pay the freight at the points of destination and remit the balance to the shipper. They also alleged that the only tariff schedules in the hands of the agents at the several points of destination fixed the legal rate at 10½ cents instead of 13 cents. Defendant further alleged that if any other tariff schedules fixing the rates between Boswell, Arkansas, and the points in Missouri were ever filed with the Interstate Commerce Commission that such was fraudulently and surreptitiously done in order to avoid protest from shippers.

The evidence was that the rate as filed with, and approved by the Interstate Commerce Commission between Boswell, Arkansas, and the points in Missouri was 13 cents from and after November 1, 1914. But defendants contend that notwithstanding that this higher rate had been made, and had been filed with and approved by the Interstate Commerce Commission, that it was not in force and effect because it had not been published, that is, that it had not been posted and placed in the hands of the station agents and shippers over the line between Boswell, Arkansas and Aurora, Missouri in accordance with the provisions of section 6 of the Interstate Commerce Act. [United States Complied Statutes, 1916, sec. 8569.]

The court at the request of plaintiff made a finding of facts and conclusions of law. Among the facts found appear the following: "Prior to any of the shipments in controversy being made the plaintiff filed with the Interstate Commerce Commission a notice of the increase of rate on the commodities mentioned in the petition between the station of Boswell, Ark., and Aurora, Hoberg, and La Russell, Missouri, of thirteen cents per one hundred pounds. Neither of the defendants or any other shippers of such commodities between said stations knew of the filing of such new rate or the effort to amend the rate and for that reason filed no protest or took any action to prevent the rate. The plaintiff did nothing to put the new rate in effect save and except to file a notice with the Interstate Commerce Commission the requisite number of days required by the Act of Congress to put such new rate into effect. That is, the court finds that it did not publish the rate by giving notice to its station agent at either of said stations from or to which said commodities were shipped as described in said petition, nor to shippers of such commodities."

Defendant, T. A. Miller, testified that he did not call on the agent at Boswell for the rates, but that he did call on plaintiff's agent at Aurora after this controversy came up. That he asked this agent if he received any change in the rate from 10½ cents, and that he was advised that no change in rate had been received. Defendant also testified that he, together with this agent, looked through the files; that he went through with them and the tariff was not changed. "I do not remember whether there were any tariffs from supplement 1 to tariff sheet 50-1, but none changing the 10½ cent rate." Defendant also testified that he called on the agents at Hoberg and La Russell and that these agents said that they had no higher rate than the 10½ cents, but the files in the stations at Hoberg and La Russell were not gone through.

A witness for defendant and the individual who looked after the shipping of these cars, as we understand

the record, testified that he called on the agent at Boswell for the tariff rate sometime in the first part of the year 1915. That he heard about the rate being raised at Boswell and asked the agent about it. "I told him (agent) I heard a report. I said: 'Jim Wood says they raised the rate on us to 13 cents.' 'No, he says, 'I guess not.' Just a day or two after that I had a letter from Mr. Miller telling me they had raised the rate from 10½ cents to 13 cents and for me to inquire of the agent for his authority and I just asked him, I says, 'T. A. wrote me they raised the rate to 13 cents.' He says, 'When'? I says, 'Sometime back, they are claiming two or three months it has been changed.' He says, 'Ain't nothing to that, I haven't got any dope on it.' I said, 'Well, T. A. wrote me last night to come over after the rates, get the rates.' He said, 'I havn't raised any and I havn't got any authority. He is just laboring under a mistake somewhere up there. They would have notified me if they had been raised.' . . . After I commenced doing the shipping and learned that 10½ cents was the rate I did not make any more inquiry about it until I was over there along the first part of the year. I then asked him for the authority that was the way I put it. He said, 'I havn't raised them.' And his copy, the way-bills copy book, still showed it was 10½ cents. We didn't know any better; didn't know any difference until in February or March; sometime the first part of the year, 1915. He didn't make any search for the tariff sheets." This witness testified that Jim Wood, the individual who first advised that these rates had been raised was a lumber man at Calico Rock, Arkansas, and shipped lumber to Joplin and different places in Missouri.

The purpose of the Interstate Commerce Act is to make as nearly certain as possible that no discrimination between shippers will be made. In 200 U. S. 1. c. 392, 26 Sup. Ct. 1. c. 277, 50 L. Ed. 515, it is said: "The all-embracing prohibition against either directly or indirectly charging less than the published rates shows

that the purpose of the statute was to make the prohibition applicable to every method of dealing by a carrier by which the forbidden result could be brought about. If the public purpose which the statute was intended to accomplish be borne in mind, its meaning becomes, if possible, clearer.''

It seems that Hunter v. Railroad, 167 Mo. App. 624, 150 S. W. 733, supports the contention of defendants that the 13 cent rate was not effective on these shipments if this rate had not been filed with the agent at Boswell and posted in the station. But it appears that the Supreme Court of the United States as well as the other Federal courts, if they ever held as in Hunter v. Railroad, supra, have later held and announced a different rule. In Hunter v. Railroad, it was held that in order to show that a rate had been established at a particular station it must be shown that the printed schedule showing the alleged established rate had been furnished to that particular station or the agent in charge thereof. If this rule be adhered to, then it would require no stretch of the imagination to conceive of likely cases where, by collusion between the agent and the shipper, a shipper might easily be favored and other discriminated against.

In International & G. N. Ry. Co. v. Carter, 180 S. W. (Tex.) 663, the Court of Civil Appeal of Texas in its orginal opinion held, following Hunter v. Railroad, supra, that it is not probable that the Congress contemplated that a rate should become effective by the mere filing with the Interstate Commerce Commission, and before the local agent knew of the same, or had a copy of the rate so that he might be guided thereby. In support of this holding the court quoted from Virginia Campany v. Railroad, 166 N. C. 62, 82 S. E. 1, which, it seems, supports the conclusion reached. But on a rehearing in the Carter case the court held that the publication referred to in section six of the Interstate Commerce Act is something that is to be done before the Interstate Commerce Commission approves the rate, and that

it might fairly be assumed that the Interstate Commerce Commission ascertained that the publication had been made as required before the schedules were adopted.

In St. Louis, Iron Mountain & Southern Railway Company, v. Wood, 207 S. W. (Ark.) 32, the identical tariff in question here was in question. The railroad company in the Wood case had sued to recover $53.60 an alleged undercharge on a shipment of lumber from Calico Rock, Arkansas, to Springfield, Missouri. The agreed statement of facts showed that the old tariff fixed by the Interstate Commerce Commission was 10½ cents, and that the Commission later raised the rate to 13 cents. That the station agent had received no notice of the raise in the rate, nor had he posted the 13 cents rate in the station; and that the station agent quoted the old rate of 10½ cents to the shipper, and showed him the old printed tariff. In the Wood case the court below held that the railroad company was entitled to recover the amount sued for, and that defendant was entitled to recover the same amount set up in his counterclaim as damages because the railroad company had failed to post the 13 cent rate, and because the agent had misquoted the rate. The Supreme Court of Arkansas reversed the lower court, and directed a verdict for the plaintiff.

The Wood case was decided on the authority of Illinois Central Railroad Company v. Henderson Elevator Company, 226 U. S. 441, 33 Sup. Ct. 176, 57 L. Ed. 290. In that case the elevator company brought suit against the railroad company to recover damages on account of failure to post its tariff rates at its station, and the misquotation by the agent of the freight rate on corn shipments in interstate commerce from the station of the railroad company at Henderson, Kentucky. The suit was originally brought in the circuit court in Kentucky. The court instructed the jury that if the loss sustained by the plaintiff was occasioned and brought about by defendant's failure to have posted or on file in its office in Henderson, Kentucky, its freight

tariff rate in question, and by reason of any erroneous quotation of defendant of its freight rate from and to the points in question of which plaintiff complains, there should be a verdict for plaintiff.  A verdict was returned for plaintiff and judgment entered thereon, and this judgment was subsequently affirmed by the Court of Appeals of Kentucky.  [Illinois Central Railroad Company v. Henderson Elevator Company, 138 Kentucky 220, 127 S. W. 779.]. The cause reached the Supreme Court of the United States by writ of error, where the judgment was reversed.  In disposing of the case the Supreme Court said: "It is to us clear that the action of the court below in affirming the judgment of the trial court, and the reasons upon which that action was based, were in conflict with the rulings of this court, interpreting and applying the act to regulate commerce.  [New York C. &. H. R. R. Co. v. United States, 212 U.'S. 504, 53 L. Ed. 627, 29 Sup. Ct. Rep. 309; Texas & P. R. Co., v. Mugg, 202 U. S. 242, 50 L. Ed. 1011, 26 Sup. Ct. Rep. 628; Gulf, C. & S. F. R. Co. v. Hefley, 158 U. S. 98, 39 L. Ed. 910, 15 Sup. Ct. Rep. 802.]  That the failure to post does not prevent the case from being controlled by the settled rule established by the cases referred to is now beyond question.  [Kansas City Southern R. Co. v. C. H. Albers Comission Co., 223 U. S. 594 (a), 56 L. Ed. 567, 32 Sup. Ct. Rep. 316.]

It is our conclusion and our holding that when a freight rate has been filed for the required length of time with the Interstate Commerce Commission and by that commission authorized and adopted that it then becomes effective although not filed with the station agents or posted in the different stations.  We agree with the Texas court in the Carter case, supra, that the publication refers to an act on the part of the company proposing the rate before it is filed with or adopted by the Interstate Commerce Commission.  If the railroad Company fails to file a schedule of its rates with its station agents and post the same as required by the

Interstate Commerce Act a penalty is provided in the Act for such failure.

In Louisville & Nashville Railroad Company v. Maxwell, 237 U. S. 94, 59 L. Ed. 853, the Supreme Court said: "Under the interstate commerce act, the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the Commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict, and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by Congress in the regulation of interstate commerce in order to prevent unjust discrimination."

In Railroad Company v. Feintuch, 191 Fed. 1. c. 485, this language is used. "The principle is that the carrier has fixed its own rate by filing the required schedule. This then becomes the lawful rate. The rate thus fixed must be deemed to be reasonable unless attacked on the ground that it is unjust and reasonable. The acceptance of a greater or less rate of charge constitutes an unlawful act."

We recognize that the Interstate Commerce Act provides that tariff schedules shall be published, etc., and that the object of publication is to give shippers information. On the other hand the regulation of rates is givn to the Act to the Interstate Commerce Commission, and when the Commission has ordered that a certain rate be effective from and after a certain date, the conclusive presumption is and ought to be in order to lessen the chances for unfair discrimination that publication was had as the law requires or else the Commission would not have put such rate into effect. When such is the case it is our opinion that the rate approved by the Commission is the lawful and only rate until another and different rate is adopted in accordance with

the Interstate Commerce Act; and that if the carrier has violated the law with reference to publication and posting such does not nullify the rate, but only subjects the carrier to the penalty provided.

The evidence in the case at bar was that it was the custom of the plaintiff to file two copies of a proposed rate with the Interstate Commerce Commission, and to mail each of its agents by railroad mail a copy of its tariffs, and to mail by United States mail a copy to the shippers on its mailing list. There was no direct evidence that copies of the tariff sheets had been mailed to plaintiff's agent at Boswell, Arkansas, and the Missouri points mentioned, but there is evidence tending to show that often times these tariff sheets are received by agents and thrown aside or stacked away without knowledge on the part of the agent as to their importance. Also it is shown that frequently agents do not understand how to interpert and arrive at a correct conclusion regarding rates when the proper tariff sheets are before them. It does appear in the record, however, that the local agents have access to the telegraph by which, if they do not know the lawful rates, or cannot interpret the tariff sheets, they may ascertain the lawful rate without any expense, and without much delay to the shipper.

The judgment below in reversed and remanded with directions to enter judgment for the plaintiff for the sum of $129.50. *Sturgis, P. J.,* and *Farrington, J.,* concur.